et al., Appellees by Edmund Siegert, Christian Andler, and Stephen Michaels. Very good. Mr. Schwartz, you may proceed. May it please the Court, good morning. Richard Schaefer pumped gasoline at the same full-service gasoline station for over 27 years, and as a result had a long chronic exposure to benzene. He developed acute myelogenous leukemia, which is a blood cancer known to be caused by benzene, and he died as a result of that. The defendants in this appeal are bulk sellers of gasoline, and I think that the easiest way to visualize this relationship is if we thought of boxes of manufacturers of gasoline with an arrow to these bulk suppliers with an arrow to Mr. Schaefer's gas station. The manufacturer's contacts were with the bulk seller, and the gas station's contacts were with the bulk seller, and the manufacturer of gasoline and the gas station didn't have contact. The bulk suppliers were the closed to the loop, and that's probably the most important fact for both of these issues before this Court. Number one, did defendants who are bulk sellers of gasoline identify the manufacturers of the gasoline that they sold to Richard Schaefer's employer? And number two, is there a question of fact as to the duty or the standard of care of these bulk suppliers of gasoline? In other words, is there a question of fact as to whether they should have warned their The first issue relates to Illinois' seller's exception statute, which is section 2-621, and that section provides that if a non-manufacturing defendant identifies the manufacturer such that the plaintiff can bring a good faith claim against the manufacturer, the strict The defendants in this case provided a list of manufacturers from whom they purchased gasoline. They provided a list of manufacturers from whom they purchased the gasoline. They could not identify the manufacturer of the gasoline they sold to Schaefer's employer because they didn't keep such records. They could have kept such records and taken advantage of this defense, but they didn't. And that would have been fine because if plaintiff could have substituted the BPs or shells of the world for these distributors, they would have. And that would have been fine, but we can't because those records weren't kept and the loop wasn't closed. Were they kept and then destroyed, or were they just not kept at all, or do you know? I don't know, Your Honor. They were not able to furnish those records. And how many manufacturers did they list when they? There were a total of 12. Twelve? Yes, sir. Defendants acknowledge that they can't identify the manufacturer of the gasoline they sold to Schaefer's employer, and their response really is three-fold. They say that plaintiff's complaint isn't sufficiently specific as to the shipments. However, the dismissal of this case wasn't based on the sufficiency of plaintiff's complaints and whether or not we would have listed each shipment, which we couldn't, would have been The second thing they say is by providing a list of gasoline manufacturers, the ball was thrown into plaintiff's court, and plaintiff should have sued these manufacturers. But once again, without the records, there's no way for plaintiff to prove a prima facie case with product identification against these manufacturers. We wouldn't have been filing these cases in good faith without those records. And that's the due diligence argument that plaintiff or defendants make in a portion of their brief, and they look to the case of Cherry v. Simons, but in that case, the defendant did identify the manufacturer, and plaintiff chose not to pursue that case. And that's not the facts of these cases, of this case. They didn't identify the manufacturer, and we weren't in a position to bring that claim against the manufacturer. It wasn't a matter of choice or diligence, it was the reality of the record situation of defendants. The third position is because Premcor was named in this lawsuit, defendants are excused from identifying the manufacturers of the gasoline they sold. The reason Premcor was named in this case was not in their capacity as a manufacturer who sold gasoline to the bulk sellers and then got to the station, but rather because before these defendants' involvement with the station, Clark Refinery had a relationship where they delivered directly to and sold directly to Mr. Plew's station, Mr. Schaefer's employer. And it was in that capacity, but it's irrelevant as to the products sold by defendants in this case. So you're saying Premcor was a manufacturer? Defendant was a manufacturer, Premcor was a manufacturer, I'm sorry, I should say, your honor, Premcor was a, Clark Refinery was a manufacturer who sold at one time gasoline directly to Mr. Schaefer's employer. But it had nothing to do with the gasoline that these distributors sold to the employer. They may have been a manufacturer that supplied them, there's no way for us to know that because there are not records. Let me, I just want to make sure I understand this, the relationship, so I understand that the defendant here, the owner of the gas station would call him up and say, hey, I need gas. And he would go to his various refiners and try to get a best price, I presume, and then Refiners, suppliers, various Well, did the gas come, the gas that went to your client here, the decedent's employer, did it come directly from refiners? Was it, in other words, shipped from Common carriers were hired by the bulk suppliers to deliver the gas from point A to the gas station. Okay, and when they went from point A to the gas station, did they have some paperwork with them? The testimony by the corporate representatives was that there would have been a delivery manifest constituting what the delivery was. And would it say from whom it was? Not MSDSs or anything of that sort. But would it say from whom it was delivered? In other words, I'm delivering you X gallons of gasoline from XYZ refinery. There was not testimony specifically as to that. What about the gas station owner? Was he asked about that? The gas station owner was asked prior to suit who he purchased gasoline from, and that's how these defendants were identified. But whose gas it was, he didn't know. He testified that he did not have any contact directly with the manufacturers because he was too small of a player. I understand, but when the guy brought the gasoline to him, when the tanker truck showed up, did the driver of the tanker truck hand him a piece of paper that says I'm unloading X gallons of gasoline from XYZ refinery? Did he get paperwork like that that would let the gas station owner know where the gasoline came from? Not that we know of. The second issue deals with the bulk seller's duty in the standard of care in this case. The trial court found as a matter of law that a bulk seller of gasoline has no duty to one. So the question before this court is whether plaintiff's evidence created a question of fact on the issue of duty. It's important to recognize that the bulk sale of gasoline occurs frequently, and accordingly there are industry practices, standards, and regulations relating to defendant's duty to warn. And as set out in plaintiff's briefs, we offer expert testimony on these issues, substantial expert testimony containing the reports of an industrial hygienist with knowledge of these issues. We provide substantial evidence as to the state of knowledge relating to benzene and gasoline over time. We offer evidence as to the standards relating to the duty to warn as promulgated by entities such as ANSI and NIOSH. We offer evidence of regulations from entities like OSHA, such as the hazardous communication standards that related to these duties. In sum, we offer a tremendous amount of objective evidence. And defendants, on the other hand, offered the subjective testimony of their corporate representatives who essentially said it wasn't our job to warn, number one. And number two, we didn't know anything about MSDSs or health effects. As set out in our briefs, the credibility of this testimony alone creates a question of fact. But plaintiffs offered so much more. And Illinois case law clearly provides that such evidence is relevant and admissible as to the standard of care or duty in this context. And at the very least, we create a question of fact as to what the standard of care was and that it include some duty to pass on what these long-term chronic effects could be and pass on information on how Mr. Schaffer could have protected himself and reduced his exposure over time. Did Mr. Schaffer's employer have a duty to warn him? He certainly had certain obligations under OSHA to provide to Mr. Schaffer. And his testimony was taken in this case. And unfortunately, he was as ignorant as Mr. Schaffer. At the very least, though, Your Honor, I believe that those duties coincided and that two wrongs don't make a right. And I get that, but I'm just wondering, it's his testimony that he didn't know about the dangers. He owned a gas station and hired people to handle that gas every day. Is his testimony any more credible? Not that it makes any difference here. We don't judge credibility, but you made a point about the credibility of some of these defendants. Well, is a gas station's owner's testimony more credible? Well, I can say this. When the defendant bulk distributors said, in fact, that they never passed on any MSDSs or information to Mr. Pluth, it made a lot more sense to me that he said he didn't know. If they had a duty to pass it on, then if the bulk seller had a duty to pass it on, then they confessed that they didn't. Yes, sir. On this issue of duty, the defendants largely rely on a concept that's raised in several Illinois cases that deals with equal or unequal knowledge. And that concept, with all due respect, does not belong in this case. And that all of those cases deal with a scenario where both the defendant and plaintiff both knew of the risk, thus the equal knowledge. And it's a different way of saying what is said in all states, which is that you don't have a duty to warn somebody of something that they already know. But that concept of unequal knowledge is never used in any cases where the defendant's saying, hey, the plaintiff didn't know, I didn't know either. Counselor, you have two minutes. Thank you. And so to stretch the equal or unequal knowledge concept to the case where the defendant is saying, well, we didn't know, does not make sense in this particular case. And the case that they most rely on, the Gray case, is in fact a case where both knew. The warnings, the labels were on the container. They were at plaintiff's place or decedent's place of employment. The testimony is that both the employer and the employee knew. And therefore, there was equal knowledge. And then there was no duty. But that would have been a different case scenario if the evidence was that the plaintiff and provided. And that's what we have here. In this instance, at the very least, with all the information the plaintiff provided, there's a question of fact as to whether or not the standard of care for a bulk supplier of gasoline has a duty to pass on certain health and safety information. And here we have nothing passed on. Thank you. Thank you, Mr. Schwartz. Mr. Siegert, you may respond. I've noticed you've reserved 13 minutes for a response. You may proceed. May I please have a card, Mr. Schwartz? My name is Ed Siegert. I represent Texor, one of the three bulk suppliers that are named as defendants in this case. Mr. Micas and Mr. Ambler represent the other two. I'm going to present the majority of the general arguments that are raised in the briefs of all of the distributor defendants. I think to really understand the legal issues here, it's important to put this back into context. And the Court has already touched on these. But we're talking about allegations of delivery of products from 1967 to 1994, a period of 20 some odd years, which is almost 20 years ago now as we stand here. The defendants that were dismissed from the case by the trial court are all bulk suppliers. None of these parties refine gasoline. We don't manufacture it. We don't add anything to it. In fact, we don't even take possession. This is a nickel and dime per multi-gallon sort of business where we try to find the best price from the refiners, and the gas stations try to find the best price from us, and that's the deal. The way that this gasoline... When you say you don't take possession, what do you mean? Don't take physical possession, Your Honor. Do nothing to the gasoline. With respect to tax order, what happens is the gas station calls around not just a tax order to the deliverer who has the best price. They find the best price with us. We then have supply from one of the refiners, and a common carrier goes out to Joliet or Romeoville, fills up the truck, and then drives to the gas station and delivers it. Along with whatever paper the government is requiring to go along. So, to be honest with you, I don't know if MSDS sheets were even in existence in 1967. There's nothing in this record that says they were, but the evidence is undisputed that whatever paperwork the refiners were required to give downstream, that's what went along in the truck, and that's what was delivered to the gas station. And Mr. Pluth, the gas station owner, he doesn't remember. We asked him this deposition, and he doesn't remember getting any paper, but it was 16, 17 years ago. The evidence from the supplier's standpoint is whatever paperwork was supposed to go went with the truck. So you're saying that your client and the other clients would never have the knowledge of benzene and its carcinogenic properties. Am I correct? We would know. That's right, Judge. And my person, my CEO, Tom Kleitzman, testified to that. He was asked, point blank, did you know that benzene in gasoline was suspected of causing cancer? No. Now, he's criticized by that from the plaintiffs, but the gentleman was under oath. He gave testimony, and that's what the evidence is in the case. And, again, we're talking 1967 to 1994. During that period of time, there were a lot of things that I think were common in our life that, looking back, we may now know caused problems, but at the time we didn't. And that goes to this whole idea of unequal knowledge. We don't have a duty to warn of something, and that's the only negligence count that survived against the defendants. We don't have a duty to warn somebody of something where we don't have greater knowledge. Now, Mr. Schwartz says, well, the guys at the gas station didn't know about the problems with benzene and gasoline causing MDL, this specific dangerous condition, but neither did we. And I suggest that there's nothing in the record that science knew back in 1967 or 1980 or 1994 that that was the case. So, I mean, it's really a—he talks about several cases in Illinois that talk about this unequal knowledge creating a duty to warn. Yeah, that's right, because it's the law. The law is we have to have greater knowledge before there's a duty to publish the documents. I'm curious because I perhaps have the wrong view of the business of the defendants here. They don't run a yard, or they store. No, sir. They don't run their own trucks. Tech Store does not. Tech Store hires—that's my client. Tech Store, we hire common carriers. But you hire common carriers who show up to a refinery and pick up the product, and the product is then taken to the consumer at the gas station. Yes, sir. Yes, sir. The gas station, right, and unloaded. And my guys don't—you know, they don't ride in the truck. They don't unload it. They don't load it. They don't do anything other than collect that small margin for whatever they bought it and whatever they sold it. And the seller's exception, which allows the seller to avoid liability by disclosure of the manufacturer, if you will, the refiner. Yes, sir. Okay. From a factual standpoint, has that seller's exception been limited to only those sellers who have taken possession of the product? No. I don't think so. Under Illinois law, I think if you're in—if you're a middleman, a distributor, as we commonly call it, you're in the chain of distribution of a product, so you are a potential defendant in that chain. Why the defendants in this case were entitled and were properly dismissed under 621 is because we did what the statute says. The statute says if you get sued for strict liability, you certify who the manufacturer is upon your initial pleading. And that's what we did. We filed an affidavit. The affidavits say we don't manufacture. We don't know of any dangerous condition with gasoline or any allegedly dangerous condition. We didn't do anything to change this product. And here are the people—here are the entities that happened to be the manufacturers. Now, the little wrinkle in this case is that because of the broad—this is not, you know, a chainsaw accident where, you know, there's a date of the accident, you know, November 1st of 1984, and there's a chainsaw involved. What the plaintiff—and the plaintiff would allege that. But here, the plaintiff says, okay, I worked at a gas station from 1967 to 1994, and you guys are it. And we say, well, you know, can you tell me when my guys sold it? No, we can't. Well, can you tell me—can you give me a year, a month, a date? No. Okay, well, here are—here's the whole scheme. Here's the whole world of companies that we, refiners, that we bought gasoline from during that period. We don't have records that go back to 1994 because we have a seven-year record retention situation, and we were sued more than seven years after 1994. So we don't have that. And we do our best, and we say, here is the world that we bought gasoline from and that was distributed in the Chicago area, one of which was Clark. Now, Clark—we say, and these defendants said, Clark was one of the companies that we bought gasoline from. Clark was sued by the plaintiff. Clark was in the case. Clark had answered. So under 621, the trial court was correct in saying, okay, company defendant has answered. They've appeared. You guys, distributors, you get out. Now, if the legislature did put a safeguard in, saying, you know, if somebody's bank—if a manufacturer's bankrupt, if a manufacturer can't be subject to jurisdiction, those other reasons that they're not amenable to suit, then if the plaintiff goes and sues them and finds out, hey, contract judges, hey, judge, they're out of business. Or, hey, judge, they're in Germany. I can't get them. Then the dismissal can be vacated if the plaintiff does something, comes to the trial court and says, hey, I tried my luck. The problem here is 13 months went by. The plaintiff did nothing. I gave them a name of five, five or so manufacturers. Nothing. Didn't try to add anybody. Didn't file them in a complaint. Did nothing. Just sat there. Cherry v. Seaman says, they can't pick and choose. Once we put the ball back in their court, they have to do something. And they didn't. The names you gave them, is there a certainty that those—each of those names actually shipped gasoline to the decedent's employer? There is not a certainty. From my perspective, from TechSource's perspective, I can't say that it is, judge. I can't. But what I can say is that those were the companies that we were buying gasoline from during a period of time. And really what it does is it also kind of reflects one of the other issues here, and that is product identification. And we talk about that with the negligence count. And that's in the briefs. And basically the only person who talks about TechSource says he'd be guessing if it was, you know, as to when, how much, first date, last date with TechSource. But that product identification problem, like we have in asbestos cases, is underlying everything here. Because I was required to certify the manufacturers right off the bat, which I did. Then I sent interrogatories into discovery to the plaintiffs saying, you know, product identification, standard product ID stuff. And, you know, tell me when. Tell me, you know, who knows. And nobody knows. Really, that product identification problem is the plaintiff's problem. That's the plaintiff's burden. The plaintiff has, you know, Schmidt v. Archer and all those cases, all the asbestos cases. The plaintiff has the burden of coming forward and saying, here's how I know it was TechSource. And so, you know, tactically, here's an admission I probably won't like to make, but tactically if I wasn't required to right off the bat certify the identity of the manufacturers, I probably would have moved, if I could do product identification discovery, I probably would have moved for summary judgment on product ID because they can't prove that either. Thank you. When was it generally known that the benzene caused the cancer? Or at least known in the business? No, sir. Back in 1967 to 1994. When was it, when did it become generally known? I don't know. I don't know. I'm sorry. Do you know one year that there was ever a government requirement for the MSDS on gasoline identifying benzene fouls? Was the government required that? There's an expert that the plaintiff has identified that we moved to strike in the trial court, which the trial court didn't get to. And I renewed it here for those purposes. And he talks about that. But there's nothing in the materials that I saw in that report that says specifically causing benzene and gasoline causing this specific injury, which is MDL. I won't even try to pronounce it, but this disease, MDL. Wouldn't it be something like the federal regs or something somewhere? It would be. I don't have that in my mind. But I think that I know that the trial court was correct in the 621 ruling. Defendants did everything they were supposed to do. The plaintiff did nothing. I know that the defendants were correctly dismissed on summary judgment on the negligence count because there is no duty. There is no duty to warrant these circumstances. I respectfully ask this court to affirm those rulings by the trial court. Thank you. Thank you, Mr. Seeger. I believe Mr. Ambler. One minute, sir. Thank you, Your Honor. May it please the court. My name is Christian Ambler. I represent Illinois Petroleum Company in this matter. I just want to make the point that the factual representations with respect to TXOR that you just heard apply equally to Illinois Petroleum for the record. Steve Stravopoulos, the corporate designee pursuant to Illinois Supreme Court Rule 206A1 for Illinois Petroleum, testified that Illinois Petroleum had no knowledge of any alleged concerns, dangers associated with benzene back in the time frame that Mr. Schaefer worked at this station. We identify, by way of Mr. Stravopoulos' deposition, for Do you happen to know when it became common knowledge or there was common knowledge in the industry that the benzene caused the cancer? Your Honor, I don't believe that it is common knowledge. I know that that is Even today? Even today. I know it's a rare phenomenon, but I mean I can't answer I don't know if it's true, but I mean That's the plaintiff's allegation. Right. No, I can't answer your question with a particular date. We also identified four manufacturers of gasoline, specifically four manufacturers of gasoline, from whom we purchased the product during the time frame that the plaintiffs alleged. All the paperwork by Mr. Stravopoulos' deposition testimony that was provided to the common carriers, we also hired common carriers to transport the gasoline, was passed along. We heard some argument earlier this morning about passing on warning material or documentation. Everything that was provided to the common carriers was passed on to the plaintiff's employer. Thank you. Thank you, Mr. Amber. Mr. Micas, same one minute, sir. Thank you. Good morning. May it please the Court. I represent Bering Petroleum. Ditto as to the paperwork. The paperwork comes from the manufacturer to the gas station. In terms of our function, what we do is we call on the telephone, find what prices are. We make a nickel per gallon, approximately. That's what we do. We talk to the gas station. We get the product there. One factual difference is that Bering Petroleum did provide specific records with regard to the manufacturers of the material. I would cite the Court to the record 961 to 972, where my client, Mr. Mancini, says, these are the specific records that we have, these are the specific manufacturers, and counsel thanks him for that and inquires with regard to that and gets clarification on those records. Unfortunately, the other defendants aren't in that position because of the age of the case. Our supply was from February of 85 to December of 87, January, March, and June of 1988. A very limited time. We certified who they were. The plaintiff did nothing in that as they should have. And my time is up. Thank you very much. Thank you, Mr. Micas. Mr. Schwartz, you may reply. Thank you. There were some questions about whether or not these defendants took possession of the gasoline. And as I understand product liability law in the state of Illinois and other states, there wouldn't be such a requirement. The important thing is the sale. And the Venus case that we cite in the brief and all kinds of other cases, they hinge the liability on the sale because that's the only appropriate way to ensure that the information gets from one person to the other. I sell it to Joe. I give Joe the information. Joe sells it to Tom. He's got to give Tom the information. And you can't rely on somebody else. The law doesn't allow it. And it wouldn't make sense because you'd never know how to close the gap. The important thing is not whether they made a nickel or a dime per gallon of gas, but the important thing is they sent that station a bill. And they received a check in return. And that's the fact on which liability hinges. There was some conversation as to keeping the records for seven years, and that's all they're required to do. Well, that's not plaintiff's burden. Plaintiff was not in the position to keep records. They were, and it's their defense. So if they want to use the defense, they should have kept the records. And we would have been happy to have a big oil defendant instead of someone that's, quote-unquote, making nickels and dimes on a gallon of gas. There was some discussion as to whatever paperwork was required by the government was sent out. I respectfully disagree that there's no evidence in this case, and nothing presented in the briefs, that whatever evidence that was required by the government was passed on. There's no evidence of that whatsoever. In fact, one of the corporate reps in this case was not surprised at all that Mr. Pluth said he never received an MSDS for this material that he used. Have you even deposed any of the manufacturers that have been identified to see what they do when somebody calls in an order and says, hey, we're going to send a tanker truck over and we want you to deliver this freight to the gas station? Your Honor, we felt like it was such a 52-card pickup that we were being presented with, just kind of thrown in our court with a bunch of names of people that may or may not be involved. I didn't feel like it was in good faith for us to name these people and go on a fishing expedition. It would have been appropriate for them to say, what's your good faith basis that we can use your property? You don't have to name them as a defendant to go take their deposition. But, Your Honor, the innocent seller statute or the seller's exception statute, it doesn't say what they're saying it should say. They're trying to expand it. It's a statute. It says the manufacturer. And if they could have identified the manufacturer, we would have been happy to do that. But they didn't. And that's what put us in the jam. It wasn't out of laziness. My office has a lot of cases where we have multiple defendants. That's not something that we fear from. It's we do try to file cases in good faith. And to say that the innocent seller statute stands for the proposition that, you know, you just go make more litigation by naming a bunch of potential manufacturers doesn't do it justice. And it can't possibly be the policy concept behind that statute. There were some questions about when it was generally known that benzene causes acute myelogenous leukemia and certain blood cancers. There is a great deal of evidence in the record on that from one of the experts reports was contained. Peter Infante was with the EPA through all this relevant period of time as to when those things were known. Because it's essential to the standard of care in this case. And that's why we presented it. Likewise, when did the duty to pass on these warnings come about? Well, the duty was there long before the early 80s. But by the middle 80s, by 1987, it was required by law. In other words, OSHA could give a violation to a seller of gasoline for not properly providing an MSDS. And that's all part of the materials we presented that create a question of fact. Because they're important facts. They're important. That's important information. And that's why we presented it to the trial court to argue that there's a question of fact as to the standard of care of a bulk seller of gasoline. Thank you. I'm sorry, did you have a question? No, no. Thank you. Thank you, gentlemen, for your arguments in this matter this morning. It will be taken under advisement. A written disposition shall issue. The court will stand at brief recess for panel change.